******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* EMMIT SCOTT
## (AC 38035)

DiPentima, C. J., and Alvord and Moll, Js.

*Syllabus*

Convicted of the crime of robbery in the first degree in connection with his alleged conduct in robbing the victims, G and R, of money and cell phones, the defendant appealed to this court, claiming, inter alia, that the trial court deprived him of his federal and state rights to due process when it denied his motion to suppress R's out-of-court and subsequent in-court identifications of him. The defendant and an accomplice, H, had approached G and R in the early morning hours while they were in G's car in the driveway of R's home. The defendant went to the front passenger side of the vehicle and, at gunpoint, demanded money and drugs, struck R with the gun, forced him to get out of the car, and took money and his cell phone from him. The defendant and H then searched the car and took G's cell phone and cash from the vehicle. H fatally shot G as the defendant and H left the scene. The police later learned that the defendant and H were to be arraigned in court on unrelated charges. L, an inspector with the state's attorney's office, accompanied R to the courthouse, where R watched the arraignment proceeding and thereafter identified the defendant and H as the assailants. H thereafter was convicted of several crimes after he was tried separately before the same trial judge who presided at the defendant's trial. The trial judge at H's trial also denied H's motion to suppress R's identifications, which involved the same identification procedure, and during H's sentencing indicated admiration for R for his conduct in cooperating with law enforcement and testifying. On H's appeal, the Supreme Court in *State* v. *Harris* (330 Conn. 91), modified the reliability standard under the federal constitution set out in *Neil* v. *Biggers* (409 U.S. 188) with respect to the admissibility of eyewitness identification testimony to provide broader protection under article first, § 8, of the Connecticut constitution. *Held*:

1. The defendant could not prevail on his claim that he was deprived of his right to due process under the federal and state constitutions when the trial court denied his motion to suppress the out-of-court and subsequent in-court identifications of him by R:

a. Even if R's identification of the defendant at the arraignment was unnecessarily suggestive, it was sufficiently reliable under the factors set forth in *Biggers*, as the trial court found, under the first two factors, that R was attentive during the encounter and had ample time to observe the assailant, who had nothing covering his face, that R was face to face with the assailant in a well lit area while the assailant went through R's pockets, and that R was next to the car while the defendant rummaged through it, and those findings were supported by the evidence, as the court was entitled to credit R's testimony that the assailants were at the car a little more than ten minutes and that the car's interior lights illuminated the defendant's face as he as rummaged through the car, R had a good view of the assailant for a considerable period of time, and R was not under the influence of drugs or alcohol at the time of the robbery and consciously tried to record a memory of the passenger side assailant so that he could later retaliate against him; moreover, under the third *Biggers* factor, R's detailed description of the defendant conformed with considerable accuracy to information in the record concerning the defendant's physical appearance, as the defendant did not dispute that he had a full beard, consistent with R's description of the assailant at the time of the robbery, any difference in appearance between R's description of the assailant's beard and the appearance of the defendant's beard two weeks later at the arraignment did not render R's identification of the defendant unreliable, the fourth *Biggers* factor, which pertained to R's level of certainty, strongly favored the reliability of the identification, as R stated that he was 100 percent certain immediately after he identified the defendant at the arraignment, and the fifth *Biggers* factor, the two week length of time between the crime and the arraignment,

did not undermine the reliability of R's identification; furthermore, R's failure to identify the defendant in police photographic arrays prior to the arraignment did not undermine the reliability of his identification of the defendant at the arraignment, as a photograph of the defendant in one of the arrays had been outdated, R testified that it was the defendant's whole body structure, demeanor and the way he walked that caused him to be 100 percent certain of his identification, the court was not required to credit the testimony of the defendant's eyewitness identification expert as to whether R's identification was undermined by certain factors and was entitled to afford weight to the factors on which it relied, and because R's pretrial identification of the defendant was sufficiently reliable, the court correctly denied the defendant's motion to suppress R's subsequent in-court identification of him.

b. The defendant's claim that R's identifications of him should have been suppressed under article first, § 8, of the Connecticut constitution was unavailing: the trial court's application of the *Biggers* framework was harmless, as it was not reasonably possible that the court would have reached a different conclusion under the modified reliability standard adopted in *Harris*, and the defendant's claim to the contrary notwithstanding, the variable of unconscious transference—the mistaken identity of a face seen in one context as a face seen in another context—was not fatal to the trial court's application of *Biggers*, as the factors in *Harris* were generally comparable to the *Biggers* factors and were intended to more precisely define the focus of the relevant inquiry; moreover, there was no indication in the record that the trial court declined to consider any portion of the testimony of the defendant's eyewitness identification expert because it believed that the evidence was not relevant under *Biggers*, and the defendant did not identify any evidence that he was prevented from presenting at the suppression hearing or at trial on the ground that it was not relevant under *Biggers*.

2. The evidence was sufficient to support the defendant's conviction of robbery as against G:

a. The jury could have reasonably inferred that R knew that G had cash and his cell phone in the car prior to the defendant's and H's search of the vehicle, and that either the defendant, H or both had taken the property: R knew that G kept cash in the car's center console, the defendant and H searched the car until one of them said, "bingo, I got it," and then they exited the car and left, and R concluded that G's cash and cell phone were missing after checking the car to see if the defendant and H had taken G's cash; moreover, the defendant was not engaged in innocent, ordinary conduct when he approached the car with a gun, asked G and R where the drugs and money were, and struck R with the gun before searching the car, and there was no testimony regarding other possible explanations for the missing money and cell phone.

b. Notwithstanding the defendant's claim that he could have been convicted of robbery in the first degree only as an accessory, the evidence was sufficient to prove that he acted as a principal, as he and H approached G's car at the same time, both had guns, the defendant asked G and R where the drugs and money were, struck R with his gun, and forced G and R to exit the car, and both the defendant and H searched the car and left once G's cell phone and cash were found and taken.

3. The trial court did not abuse its discretion in denying the defendant's motion to disqualify the trial judge: there was no concern that the trial judge would have felt motivated, in ruling on the defendant's motion to suppress, to vindicate his conclusion at H's trial with respect to the identification of H, the trial judge was not confronted with the same question in considering the defendant's motion to suppress R's identification of him that he considered in H's motion to suppress, and heard different testimony and considered different evidence at the defendant's trial, which included the accuracy of R's description of the passenger side assailant and whether the other arraignees at the arraignment were similar in appearance to the defendant, and the judge's ruling on the defendant's motion to suppress involved considerations that were independent of R's credibility; moreover, the trial judge in the defendant's case did not make any statement to indicate that he prejudged the ultimate issues on which he was to rule, and his remarks about R at H's sentencing did not indicate that he prejudged the issues raised in the defendant's motion to suppress or reflect an opinion so extreme as to display clear inability to render fair judgment.

Argued January 5, 2017, and February 4, 2019—officially released July 23, 2019

*Procedural History*

Substitute information charging the defendant with two counts of the crime of robbery in the first degree, and with the crimes of murder and felony murder, brought to the Superior Court in the judicial district of New Haven, where the court, *B. Fischer, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the matter was tried to the jury; subsequently, the court, *Clifford, J.*, denied the defendant's motion to disqualify the judicial authority; verdict of guilty of two counts of robbery in the first degree; thereafter, the court, *B. Fischer, J.*, rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Michael Dearington*, former state's attorney, and *Brian K. Sibley, Sr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Emmit Scott, appeals from the judgment of conviction, rendered following a jury trial, of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] On appeal, the defendant claims that (1) the trial court deprived him of his right to due process under the federal and state constitutions when it denied his motion to suppress an out-of-court and subsequent in-court identification of him, (2) there was insufficient evidence to support his conviction of robbery as against one of the victims, and (3) the court, *Clifford, J.*, abused its discretion by denying the defendant's motion to disqualify Judge Brian Fischer. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 31, 2012, the victims, Ruben Gonzalez and Jose Rivera, had been working together during the night shift at a warehouse in the town of Newington. When their shift ended at about 2:30 a.m., Gonzalez drove Rivera back to Rivera's home located at 49 Atwater Street in the city of New Haven. The victims arrived at Rivera's home at about 3 a.m., at which point Gonzalez parked in the driveway. They remained in the car, and Rivera began rolling a blunt of marijuana for Gonzalez. Approximately five minutes later, Rivera noticed three individuals, whom he did not recognize, riding bicycles in the street and passing by his house at least twice. Rivera became concerned and suggested to Gonzalez that they go to his backyard, but Gonzalez told him that he felt comfortable remaining in his vehicle. Moments later, two of the individuals, the defendant and Ernest Harris, approached the car on foot, with the defendant on the passenger side and Harris on the driver's side. The third individual remained in the street on a bicycle.[2]

The defendant and Harris each had a gun. The defendant asked where the drugs and money were and ordered the victims to open their doors. The victims initially refused to exit the car but did so after the defendant struck Rivera on the head with his gun. After the victims exited the vehicle, the defendant searched Rivera and took $10 and Rivera's cell phone from his pants pockets. The defendant and Harris then rummaged through the interior of the car for approximately five minutes before finding and taking Gonzalez' cash and cell phone.[3] As the defendant and Harris left the scene, Gonzalez was shot twice and subsequently died as a result of his injuries.[4] The entire incident lasted approximately ten minutes.

Jeffrey King, Jr., an officer with the New Haven Police Department, was dispatched to 49 Atwater Street in response to a call that a person had been shot. Officer King arrived to the scene at approximately 3:30 a.m.[5]

Rivera told Officer King that three males had been there, and that the passenger side assailant[6] was a black male, approximately five feet, five inches tall and 160 pounds, and had been wearing a white hat, backwards, and a black T-shirt. Francis Melendez, a detective with the New Haven Police Department, recovered two spent cartridge casings, as well as a ten dollar bill and coins from the ground next to Gonzalez' car. Inside the car, Detective Melendez located a few small, translucent "Ziploc type" bags containing a powder like substance,[7] as well as coins inside the center console. Detective Melendez was able to lift several fingerprints from Gonzalez' car, which he sent to the West Haven Police Department for processing.

At approximately 4 a.m., Rivera met with Nicole Natale and David Zaweski, detectives with the New Haven Police Department, and again provided descriptions of the assailants. He described the passenger side assailant as having a "Rick Ross"[8] type beard, which had been neatly groomed and was about one to two inches off of his face. The next day, on August 1, 2012, Detective Natale brought Rivera to meet with a sketch artist. Rivera was able to provide the sketch artist with a description of the passenger side assailant, and in that description, noted that the passenger side assailant had a full beard. That same day, Detective Natale presented Rivera with two separate photographic arrays. Neither photographic array included the defendant. Rivera did not identify anyone in the photographic arrays as either the driver's side assailant or the passenger side assailant.

During the course of her investigation, Detective Natale received information that an individual with the nickname Semi might have been involved in the July 31, 2012 incident, and later learned that the defendant had the nickname Semi. Thereafter, on August 8, 2012, Detective Natale presented Rivera with a third photographic array,[9] which included a photograph of the defendant that had been taken in March, 2011, one and one-half years earlier. Rivera did not make an identification during this photographic array procedure.[10]

On August 10, 2012, Detective Natale and Detective Zaweski interviewed the defendant.[11] The defendant initially denied that he was at 49 Atwater Street on the night of July 31, 2012. Eventually, the defendant admitted that he had been at that location, with Harris and a third individual with the nickname Do.[12] He maintained, however, that he had not been there when Gonzalez was shot. Rather, he told the police that, earlier that morning, he had purchased marijuana from Gonzalez from the passenger side of his car. The defendant stated that he, Harris, and Do then rode their bicycles down the street, but that Do and Harris turned around to return toward the direction of 49 Atwater Street. The defendant told the police that he ultimately decided to

return to 49 Atwater Street "[t]o see what [was] . . . taking them so long" and saw that everyone was outside of the car. He saw that Do had his gun out, and he heard Gonzalez say something to the effect of, "I know who you are," or, "I know y'all faces." The defendant maintained that, at this point, he turned around and started riding his bicycle toward Pine Street, which was adjacent to Atwater Street, when he heard gunshots.[13] He denied knowing who shot Gonzalez. That same day, after the police had interviewed the defendant, a fingerprint found on the front passenger side door of Gonzalez' car was identified as belonging to the defendant.[14]

Thereafter, the police learned that both the defendant and Harris were due to be arraigned on unrelated charges in New Haven on August 13, 2012. Robert F. Lawlor, an inspector with the state's attorney's office in the judicial district of New Haven, accompanied Rivera to the courthouse on that day so that Rivera could observe the arraignments and possibly identify the driver's side and passenger side assailants. Although Inspector Lawlor knew that the defendant and Harris were to be arraigned, he did not inform Rivera of that fact, and he never made Rivera aware of the defendant's name. The defendant and Harris were among fourteen arraignees who were in custody awaiting arraignment. Lawlor and Rivera sat in the front row of the courtroom's public gallery, with Lawlor seated six to eight seats away from Rivera. From his vantage point, Rivera watched the defendant, Harris, and twelve other custodial arraignees, all of whom were handcuffed and surrounded by marshals, enter the courtroom single file through the courtroom doors. Rivera recognized the defendant and Harris "[i]nstantly"[15] when they walked through the doors. Once he was outside the courtroom, Rivera told Inspector Lawlor that he was "100 [percent certain] that those [were] the guys."[16]

A jury trial followed, at the conclusion of which the defendant was found not guilty of murder and felony murder, and guilty of two counts of robbery in the first degree. The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of forty years of imprisonment, execution suspended after thirty years, followed by five years of probation. This appeal followed.

In connection with this same incident, Harris was tried separately and convicted of one count of felony murder, one count of conspiracy to commit robbery in the first degree, and two counts of robbery in the first degree. See *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018). Harris appealed, and, on March 9, 2016, our Supreme Court, pursuant to Practice Book § 65-2, transferred Harris' appeal from this court to itself.

This court first heard oral argument in the defendant's appeal on January 5, 2017. On March 29, 2017, this court issued a stay in the defendant's case pending the final

disposition of Harris' appeal. On September 4, 2018, *State* v. *Harris*, supra, 330 Conn. 91, was released by the Supreme Court. Thereafter, this court lifted the appellate stay and ordered the parties in the present appeal to file supplemental briefs to address the impact, if any, of *State* v. *Harris*, supra, 91, on this appeal. In addition to the supplemental briefing, this court ordered additional oral argument to be held on February 4, 2019. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court deprived him of his right to due process under the federal and state constitutions when it denied his motion to suppress the out-of-court and subsequent in-court identification of him by Rivera. Specifically, he argues that the August 13, 2012 arraignment identification procedure was unnecessarily suggestive and that the resulting identification was not reliable under the totality of the circumstances. Even assuming that the identification process at issue in the present case was unnecessarily suggestive,[17] we conclude that Rivera's identification of the defendant was sufficiently reliable to satisfy federal due process requirements. Accordingly, for purposes of the federal constitution, the defendant was not entitled to suppression of those identifications. Moreover, we conclude that the trial court's failure to apply the state constitutional standard set forth in *State* v. *Harris*, supra, 330 Conn. 91, which provides broader protection than the federal constitution with respect to the admissibility of eyewitness identification testimony, was harmless because the court reasonably could not have reached a different conclusion under that more demanding standard.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, the defendant moved to suppress Rivera's identification of him at the arraignment proceeding and any subsequent identification that he might be asked to make of the defendant at trial. On January 14 and 15, 2015, the court held a hearing on the motion. In addition to hearing testimony from Rivera, Inspector Lawlor, Detective Natale and Michael Udvardy, a private investigator, the court heard testimony from Steven Penrod, a psychologist, who was present at the hearing as the defendant's expert witness on eyewitness identifications. Dr. Penrod opined that the arraignment identification procedure was unnecessarily suggestive. He also testified as to numerous variables that could have affected the accuracy of Rivera's identification of the defendant. At the conclusion of the hearing, the court denied the motion in an oral ruling. At trial, Rivera testified and identified the defendant as the passenger side assailant.

In a supplemental memorandum of decision issued

after the trial, the court set forth its reasons for denying the defendant's motion to suppress. It found that the arraignment identification procedure was not unnecessarily suggestive because, of the thirty-four total arraignees, fifteen to twenty were African-American males,[18] and of the custodial arraignees, all were male and the majority of them were African-American, which matched the description of the passenger side assailant that Rivera provided to Detective Natale. Specifically, the court found that five of the African-American males who had been arraigned that day were similar to the defendant, considering their height, weight and age. The trial court also found that, even if the identification procedure was unnecessarily suggestive, the identification itself was reliable under the totality of the circumstances. In support of its conclusion, the trial court observed the following: Rivera had approximately ten minutes to observe and view the passenger side assailant during the commission of the crimes; the area was well illuminated; although the assailant had been wearing a baseball cap, it was worn backwards, which left his entire face exposed; Rivera was very close to the assailant during the crimes, and he was face to face with the assailant as he was going through Rivera's pockets taking his money and cell phone; Rivera was right next to the car as the assailant spent several minutes rummaging through the car with the car's interior light illuminating the defendant's face and features; Rivera indicated that the assailant had a distinctive beard, which he referred to as a "Rick Ross" beard; Rivera's attention was not impaired by alcohol or drugs; Rivera was able to recall the assailant's approximate age, height, weight, hairstyle and skin tone, as well as the clothes he was wearing; at the arraignment, Rivera had an unobstructed view of the defendant, who walked within a few feet of him; Rivera immediately identified the defendant as the passenger side assailant when the defendant came through the door for his arraignment; Rivera was 100 percent certain that the defendant was the passenger side assailant; and the length of time between the crimes and Rivera's identification of the defendant was fewer than fourteen days.

A

The following legal principles govern our analysis of the defendant's federal constitutional claim. "In the absence of unduly suggestive procedures conducted by state actors, the potential unreliability of eyewitness identification testimony ordinarily goes to the weight of the evidence, not its admissibility, and is a question for the jury. . . . A different standard applies when the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentifica-

tion. . . .

"The test for determining whether the state's use of an unnecessarily suggestive identification procedure violates a defendant's federal due process rights derives from the decisions of the United States Supreme Court in *Neil* v. *Biggers*, 409 U.S. 188, 196–97, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson* v. *Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). As the court explained in *Brathwaite*, fundamental fairness is the standard underlying due process, and, consequently, reliability is the linchpin in determining the admissibility of identification testimony . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 100–101. "Thus, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . Furthermore, [b]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . Nevertheless, [w]e will reverse the trial court's ruling [on evidence] only [when] there is an abuse of discretion or [when] an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of [fact bound] determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . . Finally, the burden rests with the defendant to establish both that the identification procedure was unnecessarily suggestive and that the resulting identification was unreliable." (Citations omitted; internal quotation marks omitted.) Id., 101–102.

Assuming that the identification procedure was unnecessarily suggestive,[19] we consider whether the identification was nevertheless admissible. "An identification that is the product of an unnecessarily suggestive identification procedure will nevertheless be admissible, despite the suggestiveness of the procedure, if the identification is reliable in light of all the relevant circumstances. . . . As mandated in *Neil* v. *Biggers*, supra, 409 U.S. 188, and reiterated by the court in *Manson* v. *Brathwaite*, supra, 432 U.S. 98, for federal constitutional purposes, we determine whether an identification resulting from an unnecessarily suggestive procedure is reliable under the totality of the circumstances by comparing the corrupting effect of the sug-

gestive identification against factors including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the [identification], and the time between the crime and the [identification]." (Citation omitted; internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 108. Here, as in *Harris*, the trial court made express findings regarding each of the *Biggers* factors, which we now address in turn.[20]

With respect to the first two *Biggers* factors, the trial court found that Rivera had "ample time"—approximately ten minutes—to observe the assailant. Moreover, the court found that Rivera observed the assailant from a "very close" distance, and was face to face with the assailant as the assailant was going through his pockets, and right next to the car while the defendant rummaged through it, in a well lit area. The trial court further found that Rivera was attentive[21] during his encounter with the assailant, who had nothing covering his face.[22] These findings strongly support the trial court's conclusion concerning the reliability of Rivera's identification of the defendant as the passenger side assailant, even assuming that the state used a flawed identification procedure. See *State* v. *Harris*, supra, 330 Conn. 109.

The defendant, however, challenges the trial court's findings as clearly erroneous. In particular, he maintains that Rivera initially told Detective Natale that the incident "happened very quickly," contrary to the court's finding that Rivera had approximately ten minutes to observe the assailant, and that the area was not well illuminated.[23] Having carefully reviewed the record, we disagree with the defendant that the trial court's findings are unsupported by the evidence.

First, the court's finding that Rivera had approximately ten minutes to observe the assailant was supported by Rivera's testimony that the assailants had been at the car "a little more than ten minutes." Moreover, regardless of the configuration of the lights, the trial court reasonably concluded that there was sufficient light in the area such that Rivera had a good view of the assailant for a considerable period of time. See *State* v. *Harris*, supra, 330 Conn. 109. In addition to Rivera's testimony that there had been a porch light and a streetlight, he testified at trial that the lighting was such that he could see down the street and that he did not have difficulty seeing the assailants' faces. Further, Officer King, who arrived at the scene shortly after the incident, described the location as being "well lit" and having "high visibility" due to the streetlights. In addition, the trial court credited Rivera's testimony that the interior lights in the car illuminated the defendant's face as he was rummaging through the car.

The record also supports the trial court's finding that Rivera was attentive during the encounter. Rivera testified that he was not under the influence of drugs or alcohol at the time of the robbery, and he further explained that he consciously tried to record a memory of the passenger side assailant so that he could later retaliate against him for the robbery.[24] "[A] finding of reliability may be bolstered by the witness' conscious effort to focus on the face of his assailant." *State* v. *Harris*, supra, 330 Conn. 110. The trial court was therefore entitled to credit Rivera's testimony in this regard.

With respect to the third *Biggers* factor, the accuracy of the eyewitness' description of the offender, the defendant argues that Rivera's description of the assailant had been general, rather than specific, and that his description of the assailant's facial hair had not been accurate. We disagree. Rivera's description of the assailant was both specific and accurate, and included the individual's race (African-American), gender (male), approximate age (twenties), approximate body type (medium build), approximate weight (160 pounds), approximate height (five feet, five inches), facial hair style (full beard), and clothing (white hat, black T-shirt). This detailed description conforms with considerable accuracy to the information in the record concerning the defendant's physical appearance.[25]

As we previously have noted, Rivera described the assailant as having a full beard, which he referred to as a "Rick Ross" type beard, which was neatly sculpted and one to two inches off of the assailant's face. Rivera acknowledged that, at the time of the arraignment procedure, the defendant's beard appeared "scruffy," or messy, and two to three inches long. On appeal, the defendant argues that "[t]he beard . . . is problematic because [the] defendant did not have anything resembling a Rick Ross beard when Rivera identified him not even two weeks after the shooting. While Rivera claimed that it was [the] defendant's beard that connected him to the gunman, he admitted that [the] defendant's beard was messy, scraggly and had hair all sticking out—a far cry from the sculpted, groomed Rick Ross beard that was rounded under the chin and one to two inches long." We are not persuaded by the defendant's argument.

The defendant does not dispute that he has a full beard, consistent with Rivera's description of the assailant. Moreover, Rivera's description was based on how the assailant appeared at the time of the incident, on July 31, 2012. The arraignment procedure did not take place until two weeks later, on August 13, 2012. Given the passage of time, we cannot conclude that Rivera's description of the beard, as it appeared on July 31, 2012, was inaccurate.[26] Accordingly, we conclude that any difference in appearance between Rivera's description of the assailant's beard and the appearance of the defen-

dant's beard, two weeks after the incident, does not render Rivera's identification of the defendant unreliable.[27]

The defendant also argues that the court's finding that Rivera was able to observe the assailant's hairstyle, skin tone, and clothing is clearly erroneous. We disagree. Rivera told Officer King, the responding officer, that the assailant was a black male who had been wearing a white hat and black T-shirt. Moreover, although Rivera could not see the assailant's hair because it was under his hat, he was able to observe the assailant's facial hair style, and told Detective Natale and Detective Zaweski, whom he met with less than two hours after the incident, that the assailant had a full, neatly groomed "Rick Ross" type beard. The court's finding, therefore, is supported by the evidence.

The fourth relevant consideration under *Biggers*, the level of certainty that Rivera displayed with respect to his identification of the defendant, also strongly favors the state's contention that Rivera's identification was reliable for purposes of the analysis required under the federal constitution. Rivera demonstrated not just high confidence in his identification, but "100 percent" certainty immediately after identifying the defendant.

With respect to the final *Biggers* factor, namely, the length of time between the crime and the identification, we find no merit to the defendant's contention that the two week period between the date of the crime and Rivera's identification of the defendant undermined the reliability of that identification. See *State* v. *Harris*, supra, 330 Conn. 112–13.[28]

The defendant argues that the trial court "failed to take into account numerous factors that weakened the identification." First, the defendant argues that the identification was unreliable because Rivera failed to choose his photograph in the August 8, 2012 photographic array procedure and that the trial court "ignored this evidence." In its memorandum of decision, however, the court acknowledged that the defendant's photograph was included in the August 8, 2012 array and that Rivera failed to make a positive identification during the procedure. In doing so, the court found that the photograph of the defendant that had been included in the array was "outdated  .  .  .  ." This finding is supported by Detective Natale's testimony that the photograph of the defendant was not current and that it had been taken in March, 2011, one and one-half years earlier.

Moreover, Rivera testified that he is not the type of person who can look at a photograph and make an identification. He explained that "[with] pictures, you really don't see the whole body of the person. It just shows you the face of them, so you really don't know if they're really chubby, and you don't know if they're

tall . . . you don't know anything about that." Similarly, Rivera testified that it had not just been the defendant's face that caused him to be 100 percent certain in his identification—it was "his whole body structure, like, his whole demeanor . . . like, the way he was walking . . . ." Accordingly, Rivera's failure to identify the defendant in the photographic array procedure does not lead us to conclude that his identification of the defendant, at the subsequent arraignment procedure, was unreliable.

The defendant also argues that the reliability of Rivera's identification of him was undermined by numerous factors, including the "weapon focus" effect and the effect of stress on Rivera's ability to observe the assailant, cross-race impairment, unconscious transference, and the weak correlation between a witness' confidence in his or her identification and the identification's accuracy. He argues the trial court failed to consider Dr. Penrod's testimony concerning these factors.[29]

First, in attempting to call into question the propriety of the trial court's finding regarding Rivera's level of attentiveness, the defendant relies on Dr. Penrod's testimony concerning the "weapon focus" effect and the effect of stress on Rivera's ability to observe the assailant.[30] The "weapon focus" effect is "a phenomenon whereby the reliability of an identification can be diminished by a witness' focus on a weapon . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 110. At the suppression hearing, Dr. Penrod explained that "the concern about the presence of a weapon at the scene of a crime is that it could attract people's attention away from the face of the perpetrator . . . ." With respect to the effect of stress, Dr. Penrod testified that being exposed to some level of physical violence, which includes being "pistol-whipped," would raise the stress level of an eyewitness, and that high stress conditions reduce the accuracy of eyewitness identifications.

The defendant also argues that cross-race impairment and unconscious transference undermine the reliability of Rivera's identification of him, and that the court should not have credited Rivera's confidence in his identification. With respect to "cross-race impairment," Dr. Penrod testified that studies have found "impairments [in identifications] whenever people were identifying somebody of a different race," and here, where Rivera is Hispanic and the perpetrator is African-American, there is the potential for cross-race impairment. Dr. Penrod also explained that unconscious transference, which is a phenomenon where "people can lose track of the context in which they had seen a face and mistakenly [identify] a face that they'd seen in one context as a face they've seen in another context," may have affected Rivera's identification in this case, where Rivera viewed a photograph of the defendant in the

August 8, 2012 photographic array before identifying him in the August 13, 2012 arraignment procedure. In addition, the defendant argued that "although the court credited Rivera's claim [that] he was 100 percent certain that [the] defendant was the [assailant] . . . [t]here is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy." (Internal quotation marks omitted.)

First, we note that the court was not required to credit Dr. Penrod's testimony, nor was it required to set forth specific findings related to these factors. Moreover, "even though the evidence may have supported factors tending generally to undermine the reliability of the eyewitness identifications, the trial court was not required to afford more weight to those factors here than to the factors upon which it relied." *State* v. *Day*, 171 Conn. App. 784, 822, 158 A.3d 323 (2017), cert. denied, 330 Conn. 924, 194 A.3d 776 (2018).[31] Those factors upon which the court relied—Rivera's opportunity to view the perpetrator, his degree of attention, the time between the crime and the identification, and his level of certainty—are supported by the record and by law. See id., 823; see also *Manson* v. *Brathwaite*, supra, 432 U.S. 114.

Moreover, even if the trial court fully credited Dr. Penrod's testimony concerning the weapon focus effect and the effect of stress on Rivera's ability to view the assailant, the court reasonably could have concluded that, under the circumstances, these factors did not operate to appreciably impair Rivera's ability to focus his attention on the assailant. Although Rivera testified that he had focused on the defendant's gun and acknowledged that he was "in panic mode" at the time of the incident, he also testified, as we previously have noted, that he focused on the assailant's face. Moreover, Rivera had the opportunity to observe the passenger side assailant over the course of approximately ten minutes, including while the assailant searched his pockets and rummaged through the car, during which time the gun was not pointed at him.

Similarly, even if the trial court fully credited Dr. Penrod's testimony concerning witness confidence, the court reasonably could have concluded that, under the circumstances of this case, there was a relationship between Rivera's confidence and the accuracy of his identification of the defendant. Although the defendant argues that there "is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy"; (internal quotation marks omitted); Dr. Penrod acknowledged that there is a relationship between eyewitness confidence and the identification's accuracy under certain circumstances. He testified that "[i]f [confidence is] measured at the time your identification is made before there's any possibility of feedback to the witness . . . there

is a modest relationship between confidence and accuracy," as is the case here.[32]

For these reasons, we will not disturb the trial court's conclusion that the identification was reliable, for purposes of the federal constitution, under the totality of the circumstances. Consequently, the defendant cannot prevail on his federal due process claim that the trial court improperly denied his motion to preclude testimony concerning that identification. See *State* v. *Harris*, supra, 330 Conn. 113.

In light of our conclusion that the trial court properly found that Rivera's pretrial identification of the defendant was sufficiently reliable to pass muster under the federal constitution, it follows that the trial court also was correct in denying the defendant's motion to suppress Rivera's subsequent in-court identification. "[W]hen the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor . . . both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification." *State* v. *Dickson*, 322 Conn. 410, 420, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). In concluding that Rivera's identification of the defendant was reliable, however, we necessarily have rejected the defendant's contention that the procedure that produced it created a substantial likelihood of misidentification, such that it would be fundamentally unfair for the state to use it against the defendant. See *State* v. *Harris*, supra, 330 Conn. 91. It follows, therefore, that, because Rivera's out-of-court identification of the defendant was reliable, and therefore admissible, that identification, even if the product of an unnecessarily suggestive identification procedure, cannot be deemed to have so tainted the reliability of Rivera's in-court identification as to preclude the state from using it. See id.; see also *State* v. *Dickson*, supra, 430–31 (explaining that in-court identification of defendant is admissible when prior out-of-court identification of defendant also is admissible). For that reason, we also reject the defendant's challenge to the trial court's denial of his motion to suppress Rivera's in-court identification of him.

B

We next address the defendant's contention that he was entitled to suppression of Rivera's out-of-court and in-court identifications under the due process provision of article first, § 8, of the Connecticut constitution. In *State* v. *Harris*, supra, 330 Conn. 91, our Supreme Court held that this provision affords greater protection than the federal due process clause with respect to the admissibility of an eyewitness identification following an unnecessarily suggestive identification procedure.[33] It concluded that it was "appropriate to modify the

*Biggers* framework to conform to recent developments in social science and the law." Id., 115. Accordingly, it endorsed the factors for determining the reliability of an identification that it earlier identified as a matter of state evidentiary law in *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012),[34] and adopted the burden shifting framework embraced by the New Jersey Supreme Court in *State* v. *Henderson*, 208 N.J. 208, 288–89, 27 A.3d 872 (2011), for purposes of allocating the burden of proof with respect to the admissibility of an identification that was the product of an unnecessarily suggestive procedure.[35] *State* v. *Harris*, supra, 131.

In *Harris*, the defendant claimed that if the trial court had applied the proper standard, it would have been precluded from considering Rivera's level of confidence and would have been compelled to consider the following factors: the tendency of eyewitnesses to overestimate the duration and quality of their opportunity to view the perpetrator; Rivera's lack of sleep and the poor lighting at the scene of the crime; the tendency of fear and stress to impair perception and recall; the two week interval between the crime and the observation; Rivera's nonspecific description of the perpetrator's facial features; the effect of the presence of a weapon and high levels of stress on the accuracy of the identification; and the fact that Rivera and the defendant were of different races. Id., 135. Our Supreme Court disagreed. Id. The court concluded that, although these factors were not expressly included in the *Biggers* framework, "the trial court's application of the *Biggers* framework instead of the reliability standard . . . adopted [in *Harris*] was harmless because it is not reasonably possible that the court would have reached a different conclusion as to the admissibility of Rivera's identification under [the] new framework." Id., 137–38.

The defendant argues that "[t]he facts of this case compel a different result" because in the present case, unlike in *Harris*, there was a risk of unconscious transference.[36] We are not persuaded.

Although the variable of unconscious transference is not expressly included in the *Biggers* framework, as analyzed in our case, neither were the factors at issue in *Harris*. The court in *Harris* determined that "[a]lthough the specific factors that [the defendant's eyewitness identification expert] addressed are not expressly included in the *Biggers* framework, that framework does direct the court to consider the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, and the level of certainty demonstrated by the witness at the confrontation . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 136. The court explained: "[The] general factors [set forth in *Biggers*] encompass the more specific reliability factors that we

have identified in the present case" and "the factors that we have adopted are generally comparable to the *Biggers* factors and are merely intended to more precisely define the focus of the relevant inquiry." (Internal quotation marks omitted.) Id. Thus, the variable of unconscious transference is not fatal to a finding that the trial court's application of the *Biggers* framework, instead of the reliability standard that our Supreme Court adopted in *Harris*, was harmless.

Moreover, Dr. Penrod, at the suppression hearing and at trial, testified as to the possible effect of unconscious transference. At the suppression hearing, after providing the court with a general explanation of unconscious transference, Dr. Penrod testified that, with respect to Rivera's identification of the defendant, unconscious transference "[a]bsolutely" may have come into play. At the conclusion of the hearing, defense counsel argued that unconscious transference affected the reliability of Rivera's identification of the defendant. As in *Harris*, there is no indication in the record that the trial court declined to consider any portion of Dr. Penrod's testimony because it believed that the evidence was not relevant under *Biggers*. See *State* v. *Harris*, supra, 330 Conn. 137. Finally, the defendant has not identified any evidence that he was prevented from presenting at the suppression hearing or at trial on the ground that it was not relevant under *Biggers*. See id.

Accordingly, we conclude that the trial court's application of the *Biggers* framework, instead of the reliability standard that our Supreme Court adopted in *Harris*, was harmless because it is not reasonably possible that the court would have reached a different conclusion as to the admissibility of Rivera's identification under the new framework.

II

The defendant next claims that there was insufficient evidence to support his conviction of robbery as against Gonzalez. Specifically, he argues that there was no evidence that property had been taken from Gonzalez, and even if there were such evidence, there is no evidence that the defendant was the individual who took such property. On the basis of our review of the record, we conclude that there was sufficient evidence presented at trial to support the defendant's conviction of robbery in the first degree as against Gonzalez.

The following additional facts and procedural history are relevant to our resolution of this claim. During the victims' drive from Newington to New Haven, they stopped at a gas station convenience store. Gonzalez handed Rivera cash, which he kept in the car's center console, for Rivera to purchase items at the store.[37]

When the victims were at 49 Atwater Street, after the defendant and Harris approached Gonzalez' car, the defendant asked the victims where the drugs and money

were. After Rivera exited the car, he watched the defendant and Harris rummage through Gonzalez' car, until he heard one of them say, "bingo, I got it," at which point the defendant and Harris stopped searching and left.

After Officer King responded to the scene and accompanied Gonzalez to a hospital, Rivera remained at 49 Atwater Street to talk to detectives. As he waited for the detectives to arrive, Rivera searched the car to see what the defendant and Harris took from Gonzalez. He discovered that the defendant and Harris had taken Gonzalez' cell phone and his cash.

We begin by setting forth the standard of review and legal principles that guide our analysis of this claim. "In reviewing a sufficiency of the evidence claim, we construe the evidence in the light most favorable to sustaining the verdict, and then determine whether from the facts so construed and the inferences reasonably drawn therefrom, the trier of fact reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be [proven] beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Bonilla*, 317 Conn. 758, 765, 120 A.3d 481 (2015).

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask,

instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 17, 115 A.3d 447 (2015).

Section 53a-134 (a), with which the defendant was charged, provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-119 defines larceny: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

The defendant raises two distinct arguments with respect to the sufficiency of the evidence for his conviction of robbery as against Gonzalez. Both arguments are based on his claim that there was insufficient evidence that he committed a larceny, a necessary element of robbery. Specifically, he argues that (1) there was no evidence that property had been taken from Gonzalez, and (2) even if there were sufficient evidence that property had been taken, there was no evidence that the defendant was the individual who took such property. We address each argument in turn.

A

The defendant first argues that there was insufficient evidence that he committed a larceny because there was no evidence that property had been taken from Gonzalez. Although the defendant acknowledges that Rivera took an inventory of Gonzalez' car and discovered that Gonzalez' money and cell phone were missing, he argues that "Rivera had no actual knowledge [that] there was money and a cell phone in the car prior to the 'robbery,' and he never saw what, if anything, the men took." We are not persuaded.

Contrary to the defendant's claim, the jurors did not have to resort to "mere conjecture or speculation alone." Rather, the jury could have drawn a reasonable inference that Rivera knew that Gonzalez had cash and his cell phone in his car prior to the defendant's and

Harris' search of the vehicle, and that either the defendant or Harris, or both, had taken the property, from the following evidence: Rivera knew Gonzalez kept cash in his center console;[38] the defendant asked the victims where the drugs and money were; the defendant and Harris searched the car until one of them said, "bingo, I got it," at which point they exited the car and left; Rivera checked Gonzalez' car specifically to see if the defendant and Harris had taken Gonzalez' cash;[39] and Rivera concluded that Gonzalez' cash and cell phone were missing.

The defendant nevertheless argues that his case is similar to *State* v. *Adams*, 164 Conn. App. 25, 141 A.3d 875 (2016). In *Adams*, the defendant had been convicted of conspiracy to commit larceny in the sixth degree based on the state's theory that the defendant stole Beats headphones from a Microsoft store located in the Danbury Fair Mall. Id., 27–28. On appeal, this court concluded that "the evidence was insufficient to prove beyond a reasonable doubt that the defendant or his alleged coconspirator committed a larceny"; id., 34; because "it was too great an inferential step for the court to take on this evidence to conclude that the defendant or his alleged coconspirator stole the missing headphones from the store." Id., 40.

This court explained: "[T]he fact finder would have had to infer that the missing headphones actually had been stolen by someone and removed from the store, rather than lost or misplaced within the store or taken into the possession of another customer who had not yet presented them to a sales clerk to be purchased. *However, there was insufficient evidence to support such an inference because* [*the store manager's*] *own testimony established that the opposite was true.* According to [the store manager], although she believed that the headphones had been stolen, it was possible that another customer was walking around with them at the time their absence from the accessory area was first noticed by another store employee." (Emphasis added.) Id., 38. Moreover, this court emphasized that the defendant in *Adams* had been engaged in "innocent, ordinary conduct" when he was in the public area of a retail establishment where goods were displayed for sale. Id.

The facts of the present case are wholly distinguishable from those presented in *Adams*. The defendant had not been engaged in "innocent, ordinary conduct." To the contrary, he approached Gonzalez' car shortly after 3:30 a.m., with a gun, asked where the drugs and money were, struck Rivera on the head with his gun, and then searched Gonzalez' car. Moreover, unlike in *Adams*, where the store manager had testified that it was possible that another customer was walking around with the headphones at the time they were missing, there had been no testimony in the present case regard-

ing other possible explanations for the missing money and cell phone. Thus, it was not "too great an inferential step" for the jury to conclude that Gonzalez' money and cell phone had been taken.

B

The defendant next argues that, even if there were sufficient evidence that property had been taken, there was no evidence that the defendant was the individual who took such property. Specifically, the defendant argues that the state was limited to proving his criminal liability under § 53a-134 (a) solely as a principal and that it failed to do so. We are not persuaded.

As we determined in part II A of this opinion, there was sufficient evidence presented for the jury to conclude that either the defendant or Harris, or both, had taken Gonzalez' money and cell phone. There was, undisputedly, no evidence presented at trial as to who, precisely, the defendant or Harris, if not both, had taken these items.

The defendant is correct that, in the present case, he could not have been convicted on the basis of accessorial liability because the jury was not instructed on accessorial liability. The state does not argue otherwise. Rather, the state argues that "[t]he evidence showed that the defendant and Harris acted in concert as principals in the robbery [and] . . . [that] they were working together as a team of equals." We agree with the state.

The record does not support the defendant's assertion that he could only have been convicted as an accessory. An accessory is "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense . . . ." General Statutes § 53a-8 (a). In the present case, the evidence showed that the defendant and Harris, together, as principals, committed the robbery as against Gonzalez. Both approached Gonzalez' car at the same time, and both had guns. The defendant had been the person to ask the victims where the drugs and the money were, and the defendant had been the person to strike Rivera on the head with his gun, forcing the victims to exit the car. Both the defendant and Harris searched the interior of Gonzalez' car, and once the property was found and taken—either by the defendant or Harris, or both—both men exited the car and left.[40] Thus, the evidence was sufficient to prove that the defendant acted as a principal. See *State* v. *Latorre*, 51 Conn. App. 541, 552, 723 A.2d 1166 (1999) (evidence sufficient to prove that defendant acted as principal where he and second individual, who had taken items from the victim, "were acting in concert to commit the crime"); see also *State* v. *Kalil*, 136 Conn. App. 454, 480, 46 A.3d 272 (2012) ("burglary and larceny are not crimes that only can be committed by one per-

son at a time, rather they are crimes which can be committed simultaneously by more than one individual"), aff'd, 314 Conn. 529, 107 A.3d 343 (2014). Accordingly, we conclude that there was sufficient evidence to support the jury's finding that the defendant committed the crime of robbery against Gonzalez.

## III

The defendant lastly claims that the court, *Clifford, J.*, abused its discretion by denying the defendant's motion to disqualify Judge Fischer. Specifically, the defendant argues that "any reasonable person would question the judge's impartiality and whether he was predisposed to believing Rivera's testimony" at the suppression hearing because Judge Fischer presided over Harris' trial, ruled on Harris' motion to suppress involving the same identification procedure, and "indicated his admiration for [Rivera]" at Harris' sentencing. We disagree.

The following additional procedural history is relevant to our resolution of this claim. At Harris' sentencing, Judge Fischer made the following statements: "The surviving victim, Jose Rivera, cooperated with law enforcement officials, and he courageously entered into this courtroom and testified to his observations of the robbery and shooting," and, "I give Jose Rivera so much credit for cooperating with law enforcement and for having the fortitude and courage to come into this court and confront one of the men who committed this violent, senseless act."

On December 17, 2014, the defendant filed a motion to disqualify the court, *B. Fischer, J.*, from presiding over his case on the ground that Judge Fischer had presided over Harris' case. The defendant argued that because he would be making arguments similar to those of Harris in his motion to suppress, "a reasonable person would question Judge Fischer's impartiality in the instant matter on the basis of all the circumstances." The defendant submitted a memorandum of law in support of his motion, in which he argued that "Judge Fischer, in deciding [Harris'] motion to suppress the eyewitness identification, was the fact finder and made numerous findings that will be squarely at issue in the defendant's case. It is unrealistic to expect Judge Fischer, or any judge, to stray from factual findings made in a prior case, in a subsequent case where the circumstances are substantially similar." On January 5, 2015, the court, *Clifford, J.*, held a hearing on the motion to disqualify Judge Fischer, at the conclusion of which it denied the motion.

We begin by setting forth the standard of review and legal principles that guide our analysis of this claim. Rule 2.11 (a) of the Code of Judicial Conduct provides in relevant part that "[a] judge shall disqualify himself . . . in any proceeding in which the judge's impartiality

might reasonably be questioned including, but not limited to, the following circumstances . . . (1) [t]he judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding. . . ." "In applying this rule, [t]he reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Moreover, it is well established that [e]ven in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . Nevertheless, because the law presumes that duly elected or appointed judges, consistent with their oaths of office, will perform their duties impartially . . . the burden rests with the party urging disqualification to show that it is warranted. . . . Our review of the trial court's denial of a motion for disqualification is governed by an abuse of discretion standard." (Citation omitted; internal quotation marks omitted.) *State* v. *Milner*, 325 Conn. 1, 12, 155 A.3d 730 (2017).

"[O]pinions that judges may form as a result of what they learn in earlier proceedings in the same case rarely constitute the type of bias, or appearance of bias, that requires recusal. . . . To do so, *an opinion must be so extreme as to display clear inability to render fair judgment.* . . . In the absence of unusual circumstances, therefore, equating knowledge or opinions acquired during the course of an adjudication with an appearance of impropriety or bias requiring recusal finds no support in law, ethics or sound policy." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Rizzo*, 303 Conn. 71, 121, 31 A.3d 1094 (2011), cert. denied, 568 U.S. 836, 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). "[C]ourts routinely hold that a judge's familiarity with a criminal defendant and his or her prior offenses through participation in a separate, earlier trial of the defendant . . . *or with his or her current offenses through participation in the trial of a codefendant* . . . does not create grounds for disqualification."[41] (Citations omitted; emphasis added.) Id., 120 n.39.

To support his argument, the defendant points to a variety of other cases, statutes, and rules of practice indicating that, when certain previously decided issues arise for a second time in criminal proceedings, a different judge generally should preside. See, e.g., *State* v. *Canales*, 281 Conn. 572, 599, 916 A.2d 767 (2007) ("the determination of probable cause required for issuing warrants, although not identical, is sufficiently similar to the determination required for the constitutional probable cause hearing to justify the extension, by

implication, of the preference that a different judge preside over the probable cause proceedings"); General Statutes § 54-33f (a) (judge issuing search warrant may not hear motion to suppress evidence obtained as a result of that warrant); Practice Book § 41-17 (same); General Statutes § 51-183h (judge issuing arrest warrant cannot preside over hearing attacking validity or sufficiency of that warrant); General Statutes § 51-183c (judge cannot preside at a retrial if the case has been reversed on appeal and a new trial has been granted); Practice Book § 1-22 (a) (same). The defendant points out the concern present in these situations: "Some may argue that a judge will feel the motivation to vindicate a prior conclusion when confronted with a question for the second or third time . . . ." (Internal quotation marks omitted.) *Liteky* v. *United States*, 510 U.S. 540, 562, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994) (Kennedy, J., concurring in the judgment).

The defendant argues that "[d]isqualification here is in accord with the policy behind these statutes and rules. There is no practical difference between preventing a judge who issued an arrest warrant from presiding over a probable cause hearing and preventing a judge who ruled on a motion to suppress in another case from ruling on a motion to suppress in a codefendant's case when the identification occurred at the same time in both cases and the judge has praised the courage of that eyewitness for coming forward." (Emphasis omitted.) We disagree.

In considering the defendant's motion to suppress Rivera's identification of him, Judge Fischer was not confronted with the same question that he considered in Harris' motion to suppress. Although the motions to suppress in both cases involved the same identification procedure, Judge Fischer's ruling on the motion in the present case specifically addressed Rivera's identification *of the defendant*. Thus, in considering the defendant's motion to suppress, Judge Fischer heard different testimony and considered different evidence. For example, in the present case, Judge Fischer heard testimony from a different expert witness, who testified as to reliability factors unique to this case, such as unconscious transference. See part I of this opinion. Moreover, in his analysis of whether the identification procedure was unnecessarily suggestive, Judge Fischer considered whether the other arraignees present during the arraignment procedure were similar in appearance to the defendant, looking particularly at the defendant's height, weight, and age. Similarly, in considering whether Rivera's identification was reliable, Judge Fischer considered whether Rivera's description of the passenger side assailant was accurate by comparing Rivera's description to the defendant's unique characteristics. Accordingly, unlike the situations cited by the defendant, there is no concern that Judge Fischer would have felt motivated, in ruling on the defendant's motion

to suppress, to vindicate his conclusion reached with respect to the identification of Harris.

The defendant also argues that his claim "is not that Judge Fischer should have been disqualified solely because he had previously presided over Harris' case . . . . Rather, it was the fact that Judge Fischer made remarks praising the courage of Jose Rivera, the state's key witness, which gave an appearance of partiality because it demonstrated he was predisposed to believe Rivera's testimony at [the] defendant's suppression hearing." (Citation omitted.) We are not persuaded.

In support of his argument, the defendant cites to several out-of-state cases, including *In re George G.*, 64 Md. App. 70, 494 A.2d 247 (1985), superseded by statute in part as stated in *In re Demetrius J.*, 321 Md. 468, 476, 583 A.2d 258 (1991), *People* v. *Gibson*, 90 Mich. App. 792, 282 N.W.2d 483 (1979), leave to appeal denied, 408 Mich. 868 (1980), and *People* v. *Robinson*, 18 Ill. App. 3d 804, 310 N.E.2d 652 (1974).[42] In each of those cases, the trial judges presided over the defendants' respective bench trials and, accordingly, acted as the triers of fact with respect to the determination of the defendants' guilt or innocence. Before each trial, however, the judges in these cases made statements that indicated they had prejudged the defendant's guilt. See *People* v. *Gibson*, supra, 797 (trial judge commenting on the defendant's guilt at conclusion of his codefendant's trial); see also *In re George G.*, supra, 77, 79 (trial judge telling defense counsel "[y]ou might be able to prove that [the defendant] is innocent," even though "[i]t is elementary that in a criminal case the state has the burden of proving, beyond a reasonable doubt, the guilt of the accused and that the accused need not prove his innocence" [emphasis omitted; internal quotation marks omitted]); *People* v. *Robinson*, supra, 808 (The trial judge concluded that the defendant was guilty at the conclusion of his codefendant's trial and stated, before the defendant's trial, "I heard the testimony. I came to that conclusion and my statement was correct." [Internal quotation marks omitted.]).

In the present case, unlike in *In re George G.*, *Gibson*, and *Robinson*, Judge Fischer did not make any statement to indicate that he prejudged the ultimate issues on which he was to rule with respect to the defendant's motion to suppress, namely, whether the identification procedure was unnecessarily suggestive and, if so, whether the identification was nevertheless sufficiently reliable. Even though the defendant claims that "Judge Fischer made remarks praising the courage of Jose Rivera," which the defendant characterizes as statements regarding Rivera's credibility,[43] these remarks do not indicate that Judge Fischer prejudged the issues raised in the defendant's motion. As we previously have noted, Judge Fischer's ruling on the defendant's motion to suppress involved considerations independent of

Rivera's credibility, such as factors affecting the reliability of the identification, and whether the composition of the procedure included individuals sufficiently similar in appearance to the defendant.

Contrary to the defendant's arguments, Judge Fischer's statements do not reflect "an opinion . . . so extreme as to display clear inability to render fair judgment." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 121. Accordingly, we cannot conclude that the court abused its discretion in denying the defendant's motion to disqualify Judge Fischer.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was acquitted of one count of murder and one count of felony murder.

[2] At trial, Rivera explained that the third individual remained on his bicycle, riding back and forth in the middle of the street, while telling the defendant and Harris to "hurry it up."

[3] At this time, Rivera did not see what was taken or who, as between the defendant and Harris, if not both, took it. On the basis of the evidence presented at trial, however, the jury reasonably could have found that either the defendant or Harris, or both, took Gonzalez' cash and cell phone. See part II of this opinion.

[4] At trial, Rivera testified that the defendant was the individual who shot Gonzalez. Specifically, he testified that as the defendant and Harris began to leave, Gonzalez yelled to the defendant, "I'll remember your face," whereupon the defendant turned and shot Gonzalez twice. The jury, however, found the defendant not guilty of murder and felony murder.

On appeal, in arguing that the trial court's admission of the identification evidence amounts to harmful error, the defendant mentions that "the jurors returned a mixed verdict [that] was most likely the result of compromise . . . ." Because we conclude that the trial court's admission of the identification evidence was not improper; see part I of this opinion; we need not address the defendant's argument that the admission of such evidence amounts to harmful error.

[5] Despite the early morning hour, Officer King noted that the scene was well lit due to the streetlights.

[6] Although Rivera had been providing a description of "the shooter," Rivera interchangeably referred to this single individual as the individual who had been on the passenger side of the car, as well as the individual who shot Gonzalez. Because the jury found the defendant not guilty of murder and felony murder, we refer to this individual as the passenger side assailant.

[7] The powder like substance was not tested.

[8] Rivera testified that Rick Ross is a rapper who has a distinctive beard. The state introduced a photograph of Rick Ross into evidence.

[9] Unlike the first two photographic arrays, which the police referred to as "photo boards" and included the presentation of eight photographs on a single page, this third photographic array consisted of eight separate photographs. Rivera looked at these photographs for approximately four to five minutes.

[10] Although Rivera initially commented on one of the individuals having a nose and eyes similar to those of one of the assailants, he did not ultimately identify anyone during this procedure.

[11] On August 10, 2012, the police also interviewed Harris, but Harris did not provide the police with any information.

[12] During the course of her investigation, Detective Natale learned that a man named Dana Pettaway went by the nickname of Do. Although Detective Natale attempted to speak to Pettaway, he was not cooperative. Pettaway was not arrested in connection with this incident.

At trial, the state entered into evidence a photograph of Pettaway that had been obtained by Detective Zaweski. This photograph, however, was not presented to the defendant and, therefore, the defendant did not identify Dana Pettaway as the third individual who had been present at 49 Atwater Street at the time of the shooting. On the basis of this evidence, and upon the defendant's request, the court instructed the jury as to third-party culpability.

[13] At trial, Detective Natale testified that she obtained video surveillance

footage from a nearby nursing home facility located on Pine Street. This video footage appeared to show three individuals riding back and forth on Pine Street on bicycles. At approximately 3:27 a.m., the video shows a single individual on a bicycle ride west on Pine Street, toward Atwater Street, then two minutes later, travel east on Pine Street, away from Atwater Street. Seconds later, two additional individuals travel in the same direction, away from Atwater Street. The individuals in the footage could not be identified.

[14] In addition, a fingerprint found on the driver's side door of Gonzalez' car was identified as belonging to Harris.

[15] As our Supreme Court noted in *State* v. *Harris*, 330 Conn. 91, 98 n.6, 191 A.3d 119 (2018), "[t]he trial court's . . . supplemental memorandum of decision, and testimony by Lawlor and Rivera differ on several details with respect to the arraignment process, for example, the order in which custodial arraignees entered, the number of arraignments observed, and the demographics of the arraignees. By all accounts, however, Rivera immediately identified [Harris] as he entered the courtroom, before he was actually arraigned."

[16] Rivera testified on cross-examination that Lawlor had responded that they may be the suspects, at which point the two men left the courthouse. Lawlor denied making that statement.

[17] The identification procedure at issue in the present case is the same identification procedure that our Supreme Court considered in *State* v. *Harris*, supra, 330 Conn. 91. The state argues that, although the court in *Harris* concluded that this identification procedure was unnecessarily suggestive, the identification procedure in the present case was not unnecessarily suggestive because "[t]he evidence in this case differs from the evidence relied on in *Harris* in respects that support the trial court's finding that the procedure was not unnecessarily suggestive. The evidence here showed that the police did not focus Rivera's attention specially or exclusively on the custodial arraignees. Rather, they told him to, and he did, look at everyone he saw in the courthouse, including up to fifty people in the main hallway, twenty-five people in the public section of the courtroom, and forty or so custodial and noncustodial arraignees."

It is true that, at the suppression hearing in the present case, Inspector Lawlor testified that he told Rivera to look at people throughout the courthouse, including the main hallway and in the courtroom. In addition, Rivera testified that he did, in fact, look at people in the main hallway to see if he recognized anyone. Rivera, however, also acknowledged that he knew he was not there to see if anyone in the main hallway looked familiar and that Inspector Lawlor told him to look at the arraignees that would be brought through a door into the courtroom. Moreover, in *Harris*, the trial court similarly heard testimony that Inspector Lawlor told Rivera to look at the general population in the courthouse to see if anyone looked familiar. Our Supreme Court nonetheless held that the actual, operative array from which Rivera identified the defendants consisted solely of the fourteen custodial arraignees. *State* v. *Harris*, supra, 330 Conn. 104–105.

Because we conclude that Rivera's identification of the defendant was sufficiently reliable *even if* the identification process was unnecessarily suggestive, we need not address whether any differences in the evidence presented at the defendant's suppression hearing, as compared to Harris' suppression hearing, warrant a different conclusion as to the suggestiveness of the identification procedure.

[18] The trial court, in its supplemental memorandum of decision, first found that fifteen African-American males had been arraigned that day, but subsequently found that twenty African-American males had been arraigned that day. The parties do not raise any claim with respect to that numerical discrepancy.

[19] With respect to the first prong of the test, the court in *Harris* concluded: "[W]e disagree with the trial court's conclusion that the arraignment procedure was not unnecessarily suggestive because that conclusion was based on a clearly erroneous factual finding. Specifically, the trial court found that the composition of the corporeal array was not unnecessarily suggestive because, of thirty-four total arraignees, fifteen of them matched Rivera's description of the driver's side assailant with respect to race (African-American) and gender (male). The court's conception of the array as consisting of the thirty-four arraignees, however, was significantly broader than the actual, operative array from which Rivera identified the defendant." (Footnote omitted.) *State* v. *Harris*, supra, 330 Conn. 104.

The court stated that "[t]he proper starting point for the trial court's analysis of the composition of the array . . . should have been the fourteen

custodial arraignees, only nine of whom were African-American males." Id., 105. The court concluded that the procedure was unnecessarily suggestive "[b]ecause none of [the] custodial arraignees was sufficiently similar to the defendant in height, weight and age"; id., 108; and, therefore, "the physical differences between the suspect and the custodial arraignees in the present case were clearly significant enough to emphasize or highlight the individual whom the police believe[d] was the suspect." (Internal quotation marks omitted.) Id., 107. To the extent that the testimony on this issue before the trial court in the present case differed from that in *Harris*, see footnote 18 of this opinion.

[20] Because this case involves the same incident and the same witness, our analysis is similar to that of our Supreme Court in *State* v. *Harris*, supra, 330 Conn. 91. In *Harris*, the court concluded that the identification of the defendant was sufficiently reliable for purposes of the federal constitution. Id., 113. Despite the court's holding in *Harris*, the defendant maintains that the identification was not reliable for purposes of the federal constitution. He argues that, "[u]nlike in *Harris*, Rivera's description of the suspect did not match that of [the] defendant in regards to the distinctive beard the suspect had. Moreover, Rivera had already seen a photograph of the defendant prior to the arraignment and failed to pick it out, a factor not present in *Harris* and which the trial court did not consider. Thus, the holding in *Harris* that the identification was reliable under the federal constitution is not applicable here." For the reasons set forth in this opinion, we are not persuaded.

[21] The trial court found that Rivera's attention was not impaired by alcohol or drugs, that being struck in the head by the assailant's gun did not affect Rivera's ability to observe the events that evening, and it credited Rivera's testimony that he focused on the assailant's face.

[22] The court found that, although the assailant had been wearing a hat, it was worn backwards and, therefore, his entire face was exposed.

[23] The defendant argues that, although the court found that the area was well illuminated by a streetlight and a light from 49 Atwater Street, "neither of these lit up the area" because "[t]he light on the porch was over the front door, there was a roof on the porch, and one had to walk up three steps onto the porch in order to see the light," and, although Rivera testified that there had been streetlights, he also acknowledged that there had not been one directly across the street from his house.

[24] Rivera testified that he focused on the assailant's face "[j]ust to make sure that if [he were] to retaliate [he] would make sure [he] would grab the right person and not the wrong one."

[25] During her investigation, Detective Natale found that "[the defendant] matched the description of the person who had Mr. Rivera out of the car at gunpoint."

[26] In addition to natural hair growth, the beard could have appeared different on the basis of grooming, or lack thereof, during that intervening two week time period.

[27] Regardless of any differences between Rivera's description of the beard and the appearance of the defendant's beard two weeks later, Rivera told Inspector Lawlor that it was the same beard. Moreover, Rivera did not identify the defendant based solely on the appearance of his beard. Rivera testified that, in addition to the defendant's beard, "[i]t was the eyes . . . the cheekbones, the nose . . . you can't forget a person's eyes. You can't forget it. That's stuck in your head." He stated: "You can't forget a face like that." In addition, Rivera testified that it had not just been the defendant's face that caused him to be 100 percent certain in his identification—it was "his whole body structure, like, his whole demeanor . . . like, the way he was walking . . . ."

[28] In reaching this same conclusion, our Supreme Court noted: "In a previous case, we held that the reliability of an identification was not compromised when made in connection with an unduly suggestive arraignment procedure conducted less than one month after the crime . . . and we have reached the same conclusion despite a delay of two and one-half months between the crime and an identification following the eyewitness' viewing of an unnecessarily suggestive photographic array." (Citation omitted.) *State* v. *Harris*, supra, 330 Conn. 112.

[29] Many of these factors had been recognized by our Supreme Court in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), as affecting the reliability of eyewitness identifications. Although *Guilbert* concerned the admissibility of expert testimony as to those certain factors affecting the reliability of eyewitness identifications, our Supreme Court, in *State* v. *Harris*, supra,

330 Conn. 91, endorsed those factors for determining the reliability of an identification under the due process provision of our state constitution. See part I B of this opinion. Our analysis under the federal constitution, however, continues to be governed by the *Biggers* framework. See *State* v. *Harris*, supra, 108.

[30] Specifically, the defendant argues that "Rivera's attention was impaired by the stress of the situation, the fact that he had been pistol-whipped, there was a gun in his face, and he was so angry that he couldn't focus on what was happening." Moreover, he argues that "Rivera testified [that] he was scared, upset and feared for his life, and that he told the police [that] he was rattled, yet the trial court never once mentioned those facts." (Internal quotation marks omitted.)

[31] In *State* v. *Day*, supra, 171 Conn. App. 820, the defendant argued, inter alia, that "[t]he presence of a gun . . . the effects of stress . . . [and] the effects of cross-racial identification" undermined the reliability of the witnesses' identifications of him. (Internal quotation marks omitted.) This court determined that "[a]lthough many of the defendant's arguments have merit, the factors he relies upon do not necessarily outweigh the factors underlying the trial court's conclusion." Id., 822. This court concluded, therefore, that the identifications of the defendant were not so unreliable as to require their suppression as evidence at the defendant's trial. Id., 823.

[32] Rivera expressed "100 percent" certainty immediately after identifying the defendant and before receiving any feedback from Inspector Lawlor. At the suppression hearing, defense counsel argued that Inspector Lawlor's statement to Rivera, after his identification of the defendant and Harris, that they may be the suspects; see footnote 16 of this opinion; could potentially have boosted Rivera's confidence, affecting the reliability of his identification. This argument was in line with Dr. Penrod's testimony that a statement such as Inspector Lawlor's was "a weak confirmation that the witness has made a correct identification," and that "if you give people some indication that they have made a correct identification it inflates their confidence, so if you then ask them how confident are you about your identification, you see that they can be much more confident about the identification than would be the case if you asked them before they got any feedback." Rivera, however, told Inspector Lawlor that he was 100 percent certain in his identification *before* Inspector Lawlor allegedly told him that the defendant and Harris may be the suspects, and Lawlor denied having made that statement to Rivera.

[33] In doing so, our Supreme Court overruled its conclusion to the contrary in *State* v. *Ledbetter*, 275 Conn. 534, 569, 881 A.2d 290 (2005) (overruled in part by *State* v. *Harris*, 330 Conn. 91, 131, 191 A.3d 119 [2018]), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

[34] The *Guilbert* factors are: "(1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." *State* v. *Guilbert*, supra, 306 Conn. 253–54.

[35] "Pursuant to that framework, to obtain a pretrial hearing, the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. . . . If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. . . . If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification. . . . If the defendant meets that burden of proof, the identification must be suppressed." (Citations omitted.) *State* v. *Harris*, supra, 330 Conn. 131.

[36] The defendant also argues that, unlike in *Harris*, Rivera's description of the defendant was not accurate due to his description of the assailant's beard. The accuracy of Rivera's prior description of the assailant, however,

is expressly included in the *Biggers* framework. Thus, for the reasons set forth in part I A of this opinion, we are not persuaded.

[37] At trial, the following exchange occurred between the state and Rivera:

"Q. . . . [W]here did you get the money to pay for the stuff?

"A. I grabbed it from [Gonzalez].

"Q. What do you mean you grabbed it from [Gonzalez]?

"A. He handed me some cash and he said, go in the store for me, and I went in the store and grabbed him something.

"Q. Okay. Where did he get the money from?

"A. Work.

"Q. All right. Did he keep it in any place specific in his car? . . .

"A. In his center console, I mean, like the arm . . . the armrest where he normally put stuff in."

[38] The defendant argues that "[t]here is a difference between Gonzalez 'normally' putting money in the center console and Rivera knowing for a fact there was money in the console that night." Rivera, however, had not testified that Gonzalez "normally" put money in the center console. Rather, he testified that Gonzalez gave him money to spend at the gas station convenience store and that Gonzalez kept his money in the center console, and *when describing the center console*, stated that it was where he "normally put stuff . . . ." See footnote 37 of this opinion.

[39] At trial, Rivera explained: "I had basically checked in the car to make sure what exactly did they take and, yes, *that the main priority to see if they did take his cash*, and that's exactly what happened. And they took his cell phone, my cell phone . . . and my cash and his cash." (Emphasis added.)

[40] The defendant argues that "he cannot be convicted for the acts of Harris," and "because the jurors were never told they could consider the acts of Harris as a basis for finding [the] defendant guilty of robbery, they could not have properly [found] him [guilty] on that basis." The defendant, however, was not convicted for the acts of Harris. There was no evidence presented at trial that Harris, rather than the defendant, had taken Gonzalez' cash and cell phone.

The defendant also argues that "if the state's theory at trial was that [the] defendant was guilty by acting in concert with Harris, it should have requested the court to include the 'or another participant' language from the robbery statute in its instructions." We disagree.

As previously stated, § 53a-134 (a), with which the defendant was charged, provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, *he or another participant in the crime* . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." (Emphasis added.)

In the present case, with respect to the robbery charge as against Gonzalez, the court omitted the language "or another participant" in its instruction to the jury. The "or another participant" language, however, does not relate to the commission of the larceny or robbery. Rather, it relates to the individual displaying or threatening the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm, which is not at issue on appeal.

[41] Although the defendant recognizes that a judge is not ordinarily disqualified from sitting on a case because he gained knowledge about the case or the defendant from his participation in a previous proceeding, he argues that "there is a recognized distinction between a judge who presides over a jury trial and a judge who must act as the fact finder in a proceeding." In *Rizzo*, however, our Supreme Court found persuasive *Boyd* v. *State*, 321 Md. 69, 581 A.2d 1 (1990), a case that involved successive court trials of codefendants by the same judge. In *Boyd*, the court ruled that there was no error in the denial of a motion for recusal, even though the judge acted as the fact finder in the defendant's trial and had previously acted as the fact finder in a codefendant's trial.

[42] The defendant also cites to *State* v. *Smith*, 200 Conn. 544, 512 A.2d 884 (1986), *People* v. *Silverman*, 252 App. Div. 149, 297 N.Y.S. 449 (1937), *Brent* v. *State*, 63 Md. App. 197, 492 A.2d 637 (1985), and *People* v. *Zappacosta*, 77 App. Div. 2d 928, 431 N.Y.S.2d 96, leave to appeal denied, 52 N.Y.2d 839 (1980). The present case, however, is readily distinguishable from each of those cases.

First, the courts in *Smith* and *Silverman* considered comments that a trial judge made *in front of a jury* regarding the credibility of witnesses.

See *State* v. *Smith*, supra, 200 Conn. 551 ("the trial court questioned the state's principal witness in a manner that tended to enhance the witness' credibility in the jury's eyes"); see also *People* v. *Silverman*, supra, 252 App. Div. 174 ("defendants were prejudiced by the court's commendation of the witness . . . in effect admonishing the jury thereby that he was a reliable witness"). The comments were improper in those contexts because, in a jury trial, "[d]eterminations of credibility are solely the function of the jury." *State* v. *Smith*, supra, 550. In the present case, the defendant does not argue that Judge Fischer improperly commented on the credibility of Rivera in the presence of the jury. Accordingly, we are not persuaded by the courts' reasoning in *Smith* or *Silverman*.

In addition, the courts in *Brent* and *Zappacosta* determined that the trial judges, who presided over the defendants' respective bench trials, should have recused themselves because they had heard evidence in prior, related proceedings that was both incriminating and inadmissible as against the defendants. See *Brent* v. *State*, supra, 63 Md. App. 205 ("[t]here are times when evidence is so prejudicial that we cannot assume the trier of fact will be able to put the evidence aside and arrive at an impartial adjudication" [internal quotation marks omitted]); see also *People* v. *Zappacosta*, supra, 77 App. Div. 2d 930 ("[e]ven the most learned [j]udge would have difficulty in excluding all such information from his subconscious deliberations"). In the present case, the defendant does not argue that any evidence presented at Harris' trial was inadmissible as against the defendant, or that there was any evidence that Judge Fischer would have had to disregard or set aside in ruling on his motion to suppress. *Zappacosta* and *Brent*, therefore, do not provide persuasive support for the defendant's claim.

[43] We do not view these remarks about Rivera's character as Judge Fischer's opinion with respect to Rivera's credibility. Rather, we view these remarks as being made in recognition that victims, and witnesses, may refrain from coming forward to speak with law enforcement out of fear of retaliation.